# Slate Belt Electric Street Railway Company *v.* The Public Service Commission.

*Public service companies—Contracts—Rates—Change of rates— Specific performance—Equity.*

Where the rights of individuals under a contract which would otherwise be perfectly valid are in conflict with "the general well-being of the State" the rights of the individuals must give way to the general welfare. It therefore follows that when two public service companies enter into a contract relating to rates they are presumed to do so with the knowledge that the right of the State to exercise its police power in the future is expressly reserved, and that where the common weal and the interests of the public demand that the provisions of the contract thus entered into shall be modified, it can be done without any violation of the provisions of the Constitution of the United States with reference to the impairment of the obligation of contracts. The regulation of the rates to be charged by any and every public service company is but an exercise of the police power inherent in every government and absolutely necessary for the continuance of its well-being.

Where two public service companies enter into a contract providing for a supply of electric power, the rates to be charged by the company furnishing the power are subject to supervision and control by the Public Service Commission and the contract has no binding force, when its terms conflict with the rates fixed in the method prescribed by the Public Service Company Law.

*Public service companies—Rates—Coal clause.*

A clause in the rate schedule of a public service company, regulating the price of electric power upon the varying price of coal, is not so uncertain and indeterminate as to be, necessarily, either arbitrary or unreasonable, during the unusual conditions created by the war. Where the commission has found that such a rate is reasonable in conformity with the law, the appellate court will not set aside such a finding on appeal.

Argued December 4, 1919. Appeal, No. 248, Oct. T., 1919, by complainant, from order of the Public Service Commission, Complaint Docket, No. 2311, 1918, in the case of the Slate Belt Electric Street Railway Company *v.* The Pennsylvania Utilities Company and The Pub-

lic Service Commission of Pennsylvania on appeal. Before ORLADY, P. J., PORTER, HENDERSON, HEAD, TREXLER, KELLER and LINN, JJ. Affirmed.

Complaint against Pennsylvania Utilities Company on account of schedule of increased rates.

The charges in said schedule were alleged to be unjust and unreasonable, both on account of the amount charged and because of the insertion of a "Coal Clause" regulating the rates upon the varying price of coal. The commission dismissed the complaint. Complainant appealed.

*Error assigned,* among others, was the order of the commission.

*H. M. Hagerman* and *W. S. Kirkpatrick,* and with them *J. H. McNeal,* for appellant.

*J. W. Paff,* of *Smith, Paff & Laub,* and with him *S. P. Light,* for appellee.

OPINION BY HEAD, J., February 28, 1920:

From the voluminous record accompanying this appeal we gather the following facts, which are practically without dispute except as stated, and which sufficiently indicate the nature of the questions presented for our determination:

The proceeding originated in a petition or complaint filed in August, 1918, with the Public Service Commission by the appellant. It detailed at length the nature and importance of the public service carried on by the complainant, an operating street passenger railway company, in the transportation of passengers, freight and United States mail. It averred its dependence on the intervening respondent for its supply of electric power, by force of which its cars were operated. It alleged that as long ago as 1912 and 1913, two written contracts

had been entered into with the respondent company, or its predecessor in title, by the terms of which that company agreed to furnish electrical power for a period of ten years, at rates fixed in the contract; that the power company had broken its contract, had demanded higher rates for the public service it furnished than those provided for in the contracts and had enforced payment of such rates by threats to discontinue the service. As a result of this conduct, the complainant alleged it had been forced to make payments in excess of its contract obligation to the extent of about $2,600. It prayed for an order in the nature of an injunction to restrain the power company from the further imposition of any rates higher than those agreed upon in the private contract between the two companies, already referred to. It asked for an order in the nature of a decree for the specific performance of said contract and finally for an order of reparation, requiring the power company to repay to it the excess sums that had been improperly and unjustly extorted from it, aggregating, as we have said, about $2,600.

The Intervening Power Company filed its answer denying many of the facts averred in the complaint, and especially setting up that the complainant had frequently defaulted in the payment of the sums due under the original contract and had thus rendered necessary a substantial modification of the same, which had been observed during a sufficient length of time to enable the complainant to make good the considerable sums in which it had defaulted; that owing to conditions that existed in the summer and fall of 1917, the price of coal, which constituted the chief element of cost in the production of electric power, had so advanced and become so uncertain that it was impossible for the power company to make any approximately accurate estimate in advance of the cost of producing its power from month to month. It, therefore, on November 15, 1917, filed with the Public Service Commission a new schedule of

rates, which, after being posted and published as required by law, and in the absence of objection from any source, became effective on December 15, 1917. This schedule contained what is so often referred to in the record as the "coal clause," and this clause is asserted by the complainant to have been the instrumentality by which the alleged excess charges were extorted from the complainant. This clause fixed the rates to be charged for power on the basis of a coal cost to the power company of $2.70 per ton. It provided that for every increase of eight cents per ton in excess of $2.70, the consumer should pay a small fractional sum per kilowatt hour over and above the ordinary rate provided, and that for any decrease in the price of coal below $2.70, a like reduction should be made in the cost per kilowatt hour. This clause appears to be the center of the target aimed at by the complainant, on the grounds that it worked a substantial increase in the price of the power used by the complainant over and above the agreed on contract price, and further because it provided an uncertain and therefore an unreasonable and illegal rate.

The commission, with great propriety in our judgment, concluded it was not within its functions to undertake to enforce private contracts between two corporations, even though both were public service companies. That its proper duties were to ascertain whether or not the power company was performing its public service at reasonable and lawful rates, and that it would not and could not, in the discharge of its public duties, create or enforce rates that were to be dependent upon private or individual contracts made with particular consumers, with the idea of establishing such rates, and thus placing them beyond the control of the State, or its duly authorized commission. We shall, therefore, briefly consider the two questions, and the only two that seem to us to be involved in a review of the order made by the Public Service Commission.

1. For quite a number of years past, it has become the settled legislative and judicial policy, both in the nation itself and the several states of the union, to compel public service corporations to place all of their patrons on terms of equality, and to destroy, as subversive of the public well-being, every kind of instrumentality by which discrimination between patrons, advantageous to one and harmful to another, could be kept alive. It would be but the most indefensible parade of learning to now begin at the beginning and trace through legislatures and courts the rise and steady and continuous development of this principle. Who does not now regard as settled beyond debate that the regulation of the rates to be charged by any and every public service company, is but an exercise of the police power inherent in every government, and absolutely necessary for the continuance of its well-being. In Louisville & Nashville R. R. Co. v. Mottley, 219 U. S. 467, the Supreme Court of the United States had before it a question that involved, in principle, every proposition that is here urged upon us. Mr. Justice HARLAN in a careful and elaborate opinion reviews all of these questions and plants the right and power of the State to control rates in a position that has remained impregnable. After considering a number of cases disposed of in more recent years by that high tribunal, the opinion uses this language: "Long before the above cases were decided, it was said in Knox v. Lee, 12 Wall. 457, that 'as in a state of civil society property of a citizen or subject is ownership, subject to the lawful demands of the sovereign, so contracts must be understood as made in reference to the possible exercise of the rightful authority of the government, and no obligation of a contract can extend to the defeat of legitimate government authority.'" The principle there cited has been followed and applied in numerous cases in our own Supreme Court and this court. In the very recent case of V. & S. Bottle Co. v. Mountain Gas Co., 261 Pa. 523, precisely the question here involved was at issue, and the

right of the gas company to adopt a schedule of rates that would enforce the payment of a larger sum by a consumer than had been previously agreed upon in a private contract between the two parties, was declared to be unquestioned.

In Schaper v. Railway Co., 265 Pa. 109, the appellant had granted and conveyed an easement through his own land to the railway company, in consideration of which it obligated itself to thereafter sell round-trip tickets and books of tickets at certain rates. Later on new schedules increasing these rates were filed with the Public Service Commission, and duly became effective. The appellant sought to have his contract enforced and specifically performed. In affirming the decree of the court below dismissing his bill, the Supreme Court thus strikes at the very root of all such cases: "The contract which the appellant would specifically enforce, was valid when made, but the parties to it entered into it subject to the power of the State to change the rates in the future in the exercise of its governmental authority: Vide Louisville & Nashville R. R. Co. v. Mottley, 219 U. S. 467, and cases there cited." Once more the exact question we have before us was most carefully considered in the case of Leiper v. B. & O. R. R. Co., 262 Pa. 328. Again there was a grant by the appellant of a right-of-way through and over the land of the appellant, and the consideration for the grant was a contract to carry the stone from the appellant's quarries at freight rates not exceeding those detailed in the contract. At the expense of some brevity, we quote from the opinion of Mr. Justice Fox a statement of the controlling principle, than which no language of ours could possibly be more lucid: "Where the rights of individuals under a contract which otherwise be perfectly valid, are in conflict with the 'general well-being of the State' the rights of the individuals must give way to the general welfare. It therefore follows that when, as in this case, the parties enter into a contract with a public service corporation relating

to rates, they are presumed to do so with the knowledge that the right of the State to exercise its police power in the future is expressly reserved, and that where the common weal and the interests of the public demand that the provisions of the contract thus entered into shall be modified, it can be done without any violation of the provisions of the Constitution of the United States with reference to the impairment of the obligation of contracts." And so this court has uniformly held to the same principle: In re Petition of Relief Electric Light Co., 63 Pa. Superior Ct. 1; Wilkinsburg Borough v. Public Service Commission, 72 Pa. Superior Ct. 423; Foltz v. Public Service Commission, 73 Pa. Superior Ct. 24, and numerous other cases. Stripped then of all disguises, the injury the complainant seeks to redress by this proceeding, flows from the fact it entered into a private contract with another public service company, fixing, for a period of years, the rates to be charged by that company for the public service it might render to complainant in common with the public at large. That such contract is protected by the federal constitution so that, during its term, the rate-making power of government must be suspended, and the complainant permitted to enjoy a status created by its own act, differing from that created by public law for all of the other patrons of the power company. The answer looms large in the decisions referred to and the legislation on which they rest. Its meaning is unmistakable, its force irresistible, its authority overwhelming. We must conclude, therefore, on this branch of the case that the order of the Public Service Commission refusing to enter a decree in the nature of a restraining injunction and declining to make an order of reparation, to the extent of the alleged excess charges, was a proper and correct order and ought not be interfered with.

2. The commission has found that the rate complained of, under the operation of the so-called coal clause of the schedule, was not so uncertain and indeterminate as to

be necessarily either arbitrary or unreasonable, and therefore unlawful.    The situation that existed whilst this government was actively engaged in a state of war is portrayed in the report of the commission.    It makes reference to the common knowledge of the business world that transactions of the utmost importance in that world were necessarily carried on upon a similar basis and this for the very substantial reason, among others, that it was difficult to find any other kind of a basis upon which forward contracts could be made.    We see no ground upon which an appellate court could determine that such a conclusion was unreasonable and resulted in an illegal rate.    On the contrary we find the reasoning of the commission to be forceful and convincing and furnishing substantial ground for its own conclusion.    After a careful study of the entire record, we are all of the opinion that the order of the commission should be affirmed and this appeal dismissed at the costs of the appellant.