# Duquesne Light Co. et al., Appellants, *v.* The Public Service Commission.

*Electric light companies—Steam heat companies—Rates—Contracts—Effect of contracts—Schedule of rates filed.*

A private contract between a public service company and an individual, providing for the heating and lighting of three office buildings, must be considered to have been made subject to the right of the Public Service Commission to change the rates, in accordance with the powers conferred under the Public Service Company Law. All provisions contained in such contracts in regard to rates and service may be changed under the procedure before the commission, and the new rates supersede the contract rates, subject to review by the commission.

Any contract, stipulating for a lower rate than is set forth in the schedule filed with the Public Service Commission, is unlawful and discriminatory. The Public Service Company Law authorizes a public service company to establish rates and to make them effective in accordance with its terms. Such rates then become the only lawful rates collectible. The company may not lawfully disqualify itself by contract with a patron from so establishing rates and collecting them. Where one's rights are subject to state restrictions, he cannot remove them from the power of the state by making a contract about them. The contract will carry with it the infirmity of the subject-matter.

To permit a contract made between the public service company and an individual to stand, as against rates established in a legal and orderly method and in conformity with the provisions of the law, would be to nullify the purpose of the Public Service Company Law. Both parties are alike charged with full knowledge of the prescribed rates. No agreement for a rate other than that prescribed for the particular service can have any binding force.

A rate to be charged by a public service company becomes, on the effective date, an effective rate and as such it is a collectible rate or one which may be sued for. There can be no legal rate except the last tariff rate published as provided by law, and the effective rate thus published supersedes all prior rates covering the service therein called for. The Public Service Company Law does not recognize any right to change a rate, other than a published tariff rate. It cannot be varied by the parties and the company departs therefrom at its peril. Having satisfied every requirement of the act, it has become a collectible, suable rate until it is

set aside in the method provided by the act.  It is, therefore, for the time being, a legislative rate.

Argued April 18, 1921.   Appeal, No. 110, April T., 1921, by Duquesne Light Company and Allegheny County Steam Heating Company, from order of the Public Service Commission of the Commonwealth of Pennsylvania, Complaint Docket No. 2942, in the case of Duquesne Light Company and Allegheny County Steam Heating Company v. The Public Service Commission of the Commonwealth of Pennsylvania, Adelaide H. C. Frick, Helen C. Frick, Childs Frick, Henry C. McEldowney and William Watson Smith, Executors of the Will of Henry C. Frick, deceased, and the Union Trust Company of Pittsburgh, Trustee for Helen C. Frick under said Will, Intervening Appellees.   Before ORLADY, P. J., PORTER, HENDERSON, HEAD, TREXLER, KELLER and LINN, JJ.   Reversed.

From the record it appeared that H. C. Frick filed a complaint with the Public Service Commission, alleging that he entered into certain contracts with the Duquesne Light Company and the Allegheny County Steam Heating Company, dated November 15, 1916, wherein it was agreed that the said companies would furnish to the complainant electric current and steam at certain rates for 25 years; that the respondent companies had filed schedules increasing their rates and were charging complainant at the increased rates.  Answers were filed by the respondent companies setting forth that they had filed schedules at increased rates and could not longer furnish current and steam to the complainant at the contract rates.  The commission made an order finding that the rates as set forth in the contract for the first period thereof were reasonable and directed that the respondent companies file schedules with a classification, which would include complainant and such other of their patrons as may hereafter fall within the said

classification, at a rate in accordance with the private contract. The respondents appealed.

Other facts are set forth in the opinion of the Superior Court.

*Error assigned,* among others, was the order of the commission.

*Edwin W. Smith,* of *Reed, Smith, Shaw & Beal,* and with him *A. W. Robertson,* for appellants.—The contracts are ineffective as against higher published rates: Leiper v. The Baltimore & Philadelphia R. R. Co. et al., 262 Pa. 328; Schaper v. Cleveland & Erie Ry. Co., 265 Pa. 109; V. & S. Bottle Co. v. Mountain Gas Co., 261 Pa. 523; Klein-Logan Co. v. Duquesne Light Co., 261 Pa. 526; James A. Whitcomb v. Duquesne Light Co., 4 P. C. R. 444; Armour Packing Co. v. United States, 209 U. S. 56; Suburban Water Co. v. Oakmont Boro., 268 Pa. 243; Pinney & Boyle Co. v. Los Angeles Gas & Electric Co., (Cal.) L. R. A., 1915, C. 282, 287.

*P. C. Knox* and *George B. Gordon,* of *Gordon & Smith,* and with them *Frank B. Ingersoll,* for appellees.—There is nothing in the Public Service Company Law invalidating contracts, where the contract rates were the tariff rates when the contract was made, so long as the contract rates remain reasonable: Leiper v. R. R. Co., 262 Pa. 328; Slate Belt Elec. Street Ry. Co. v. Public Service Comm., 73 Pa. Superior Ct. 493; Wilkinsburg v. Pittsburgh Rys. Co., 6 P. C. R., 281; Baltimore County Water and Electric Co., P. U. R., 1918, F. 522; N. Y. & Queens Gas Co. v. McCall, 245 U. S. 345.

The light, heat and power demands of the buildings of the complainant required a separate classification and the maintenance of the rates in effect when the contracts were made: Mercur v. Electric Light, etc., Co., 19 Pa. Superior Ct. 519; Hoover v. P. R. R. Co., 156 Pa. 220; Bald Eagle Valley R. R. Co. v. Nittany Valley R. R. Co.,

171 Pa. 284; P. & L. E. R. R. Co. v. Colonial Steel Co., 251 Pa. 460; C. D. & P. Tel. Co. v. Com., 114 Pa. 592; Baily v. Fayette Gas-Fuel Co., 193 Pa. 175; Allegheny County Light Co. v. Shadyside Electric Light Co., 37 Pa. Superior Ct. 79; Steinman v. Edison Electric Illuminating Co., 43 Pa. Superior Ct. 77; Manufacturers Ry. Co. v. U. S., 246 U. S. 457; Interstate Commerce Commission v. B. & O. R. R. Co., 145 U. S. 263; L. & N. R. R. v. Behlmer, 175 U. S. 648; East Tenn. Ry. Co. v. I. C. C., 181 U. S. 1; I. C. C. v. L. & N. R. R., 190 U. S. 273; I. C. C. v. Chicago G. W. Ry. Co., 209 U. S. 108.

*Frank M. Hunter,* Counsel, and with him *John Fox Weiss,* Assistant Counsel, for the Public Service Commission.

Opinion by Linn, J., July 14, 1921:

The question is whether schedule F in appellant light company's tariff for electricity, and schedule A in appellant heating company's tariff for steam are applicable to the service rendered to a group of office buildings in Pittsburgh owned by the late H. C. Frick.

Schedule F contained the rules, regulations and rates for users of "wholesale light and power." "This schedule," as the commission said, "provided for a demand charge applicable to all consumers, and for an energy charge divided into three blocks so that as the demand on the system, the maximum demand, increases, the charges in the first and second block decrease with respect to the number of kilowatt hours charged in each block. The schedule recognizes as a principle in rate making, the giving of an advantage in rates both on higher demands and on the greater amount of energy consumed." Schedule A contained the rates for wholesale users of steam.

Mr. Frick began taking electricity and steam from appellants pursuant to contracts dated November 15, 1916.

The buildings were occupied by his tenants for offices and shops.

The light company's tariff, effective when the service began, contained subdivisions lettered from A to G inclusive, applicable to as many classes of patrons. The Frick buildings were in the class chargeable by schedule F. In May, 1918, in the manner specified in the statute, the light company put into effect a tariff increasing both the demand and energy rates of schedule F as of May 31st. An increase was also made in the steam schedule A. We are advised that in consequence of a mistake of law, although the increased rates had become effective, appellants sent bills and received payment at the old rates until September 23, 1918. When this delinquency was discovered bills were sent at the tariff rates with the result that Mr. Frick filed this complaint against appellants jointly, based upon the proposition that they had disqualified or incapacitated themselves from raising the rates for his buildings by the contracts made with him November 15, 1916, by which appellants had agreed not to raise the rates chargeable to him for electricity and steam for twenty-five years except at intervals of five years and then only according to increases in the coal price as minutely specified in the contracts. In his complaint he alleged: "11. Said agreements for the supply of electric current and steam, respectively, are valid and binding upon the parties thereto. 12. The contract rates for the electric current and steam, respectively, provided for in the said agreements are reasonable and adequate remuneration for the same in view of the circumstances under which the supply is being, and will be, furnished. 13. Any rates for electric current and steam, respectively, supplied and to be supplied to said three buildings owned by complainant, in excess of the contract rates aforesaid, are unjust, unreasonable and excessive and constitute an unlawful discrimination against the complainant in violation of......the Public Service Company Law......" His counsel accordingly

claimed that these contracts prevented increasing the rates for the service to his buildings and at the hearing thus stated his position to the commission: "The claim of the petitioner is, first, that these contracts are good contracts. Second, that irrespective of whether the contracts are good or bad, the contract rates are remunerative. We now stipulate of record that in this case we will not attempt to show the value of the entire property of the respondent, nor will there be any effort made to prove that the total revenue received by the respondent is excessive. We don't wish to go into a hearing at all, and for the purpose of this hearing we waive any such question. In other words, we will try this case on the question of the contracts and on the question of discrimination as against Mr. Frick."

As the complaint was filed after the rates had become effective, the burden of proof was on complainant: New Cumberland Borough v. Pub. Ser. Com., 76 Pa. Superior Ct. 382. Prima facie, both schedules were reasonable as to rate and classification. The legal question brought to this court is whether there is sufficient evidence in the record to sustain the order of the commission. We shall determine it by considering the two matters so stated to the commission by counsel: (1) the effect of the contracts on the point presented; (2) the charge of unjust discrimination.

1. Considering what was said in argument here and in the report of the commission about contracts concerning effective tariff rates and particularly the contracts in this case, it seems necessary to repeat in part what has been decided on that subject as related to these contracts. The Public Service Company Law authorizes a public service company to establish rates and to make them effective in accordance with its terms; such rates become the only lawful rates collectible; the company may not lawfully disqualify itself by contract with a patron from so establishing rates and collecting them. When one's rights are subject to state restriction he

"cannot remove them from the power of the state by making a contract about them. The contract will carry with it the infirmity of the subject-matter: Hudson County Water Co. v. McCarter, 209 U. S. 349, 351": Union Dry Goods Co. v. Georgia Pub. Ser. Corp., 248 U. S. 372, 375. "To permit the contract made between the appellee and appellants to stand as against rates established in a legal and orderly method and in conformity with the provisions of the law would be to nullify the purposes of the act": Leiper v. Railroad Co., 262 Pa. 329, at 331, 332. "Both parties are alike charged with full knowledge of the prescribed rates; and if either comes short in this it is his own fault through negligence, or what is worse, and neither may excuse himself by showing reliance upon representations as to prescribed rates other than those appearing in the printed and published schedule. No agreement for a rate other than that prescribed for the particular service can have any binding force. No matter how induced, the law will refuse to recognize in it any of the characteristics of a contract......It follows necessarily that when these defendants accepted the services of the plaintiff as carrier, the only contract under which the service was rendered was the implied one that they would pay for the service at the rate prescribed by law, seeing that that was the only rate by which the carrier was allowed to render the service......The principle asserted in these cases, that is, that the private agreement between the parties for a rate other than that prescribed is not a contract, and cannot be regarded, is fully recognized in Texas and Pacific Railway v. Abilene Cotton Oil Co., 204 U. S. 426, and in Kansas City Southern Railway v. Albers Commission Co., 223 U. S. 573, and in other cases which might be cited": Central Railroad v. Mauser, 241 Pa. 603, at 605.

"A rate becomes on the effective date an effective rate and as such, it is a collectible rate, or one that may be sued for. There can be no legal rate except the last

tariff rate published as provided by law:......and the
effective rate thus published supersedes all prior rates
covering the service therein called for......The Public
Service Law does not recognize any right to change a
rate other than a published tariff rate......Moreover,
when a rate becomes effective, it is a rate established by
law. It cannot be varied by the parties and the company
departs therefrom at its peril. Having satisfied every
requirement of the act, it has become a collectible, suable
rate until it is set aside in the method provided in the
act. It is, therefore, for the time being a legislative
rate": Suburban Water Co. v. Oakmont, 268 Pa. 243,
248, 252.

In Armour Packing Co. v. United States, 209 U. S. 56
at 81, in considering a case where as here the contract
provided for the collection of rates in effect when made,
and where the period was but a very short time, the court
says: "There is no provision excepting special contracts
from the operation of the law. One rate is to be charged
and that the one fixed and published in the manner
pointed out in the statute and subject to change in the
only way open by the statute. There is no provision for
the filing of contracts with shippers and no method of
making them public defined in the statute. If the rates
are subject to secret alteration by special agreement,
then the statute will fail of its purpose to establish a
rate duly published, known to all and from which nei-
ther shipper nor carrier may depart."...."If the shipper
sees fit to make a contract covering a definite period for
a rate in force at the time, he must be taken to have done
so subject to the possible change of the published rate
in the manner fixed by statute, to which he must conform
or suffer the penalty fixed by law": Ibid, p. 82.

In Slate Belt Co. v. Pub Ser. Com., 73 Pa. Superior Ct.
493 at 496, we said, "The commission, with great pro-
priety in our judgment, concluded it was not within its
function to undertake to enforce private contracts be-
tween two corporations, even though both were public

service companies. That its proper duties were to ascertain whether or not the power company was performing its public service at reasonable and lawful rates, and that it would not and could not, in the discharge of its public duties, create or enforce rates that were to be dependent upon private or individual contracts made with particular consumers, with the idea of establishing such rates, and thus placing them beyond the control of the State, or its duly authorized commission." Other authorities to the same effect are familiar.

What then are the facts to which those rules must now be applied? In addition to such as have been stated, we quote the following from the intervening appellees' brief: "Mr. Frick built in the City of Pittsburgh three large office buildings,—the Frick, Frick Annex and the Union Arcade, completed in 1902, 1906 and 1917, respectively......When the Frick Building was completed in 1902, it was furnished with the equipment required to supply electric current for light and power and steam for power and heating purposes, and when the Frick Building Annex was completed, the basements of the two buildings were connected to form one large room, and the apparatus of the Frick Building supplied electric current and steam for the said purposes of the Frick Building Annex. From the time of completing the said two buildings, Mr. Frick continuously supplied his requirements of electric current and steam therefor by the use of said apparatus, until the year 1916, when he made the agreements with appellants, which are in question in this proceeding......No provision was made by Mr. Frick for supplying light and heat to the Union Arcade Building for the following reason: In 1915, the Union Arcade Building was in process of construction and Mr. Frick proposed either to install and operate therein the necessary machinery and equipment for furnishing electricity and steam for that building, or to supply the building by the use of the equipment in the Frick Building by means of a tunnel to be constructed to connect the

two buildings. During this year, at the solicitation of the light company, Mr. Frick made two agreements, one dated October 15, 1915, with the light and steam company, respectively, by which the two companies agreed to supply the electric current and steam required in the operation of the Union Arcade Building, the prices for such service being the same prices for steam and electric current, respectively, set forth in the subsequently executed agreements of November 15, 1916. No electric current or steam was ever actually furnished under the two agreements of 1915, and the two said agreements of 1915 were cancelled at the time of executing the 1916 agreements......" From appellants' brief we add the following: "One of these [1916] agreements was a lease from Mr. Frick to the light company, by which he leased to the light company for the term of twenty-five years about fifteen thousand square feet of floor space in the basement of the Frick Building and Annex for the use by the light company as a substation for the transformation and distribution of electric current, with the right to sublet to the steam heating company for the generation and distribution of steam. The light company agreed to construct a tunnel under Fifth Avenue connecting the Frick Building and the Arcade, and Mr. Frick granted a right of way through this tunnel and through the Arcade, the Frick Building and Annex for the conduits, cables, steam mains, pipings and other appurtenances of the two companies. The annual rent was $10,000.

"By the second of these agreements, the light company agreed to supply and Mr. Frick agreed to take the electric current for light and power for the three buildings for the term of twenty-five years. The rate for current as specified in the agreement was the rate set forth in the light company's schedule 'F' in effect at the time of making the agreement. This rate was subject to adjustment at the expiration of each period of five years, de-

pending upon the price of coal delivered at the light company's plant at Brunots Island.

"By the third agreement, the steam heating company agreed to supply and Mr. Frick agreed to take all the steam for heating the three buildings for twenty-five years. The rate for steam as specified in the agreement was the rate set forth in the steam company's schedule 'A' in effect at the time of making the agreement. This rate was subject to adjustment [same as the rate for current]."

"By the fourth, in the form of a bill of sale, Mr. Frick sold to the light company all the machinery, tools, etc., constituting his electric and steam plant in the Frick Building and Arcade for $50,000."

The lessee entered and continued in the enjoyment of the premises demised; the vendor delivered and the vendee paid for and accepted "all the machinery, tools and equipment" specified in the bill of sale; appellants furnished electricity and steam to the group of buildings under schedules F and A and were paid therefor at the schedule rates. With such results of their negotiations as stated in the contracts so accomplished in fact, appellants filed tariffs increasing the rates as we have stated and this suit followed.

The commission concluded that the new schedules were "under all the evidence unjust and unreasonable as affecting the complainant and [their] continuance would be unjustly discriminatory and unduly and unreasonably preferential as against him." We are of opinion that the order appealed from is unreasonable and based on incompetent evidence materially affecting the determination of the commission within section 26, article VI, P. L. 1427.

The report states that its conclusion is supported by "[1] the failure of the respondents to enforce the increase; [2] together with their agreement as to what was a just and reasonable rate, at least for the period of five years; [3] with the other evidence in the case....."

1. "The failure of the respondents to enforce the increase," or, in other words, their performance of the contract for several months by collecting at the old rate after the effective date of the new rate, was a violation of the statute; certainly such delinquency of a public service company cannot be evidence that a lawful, statutory rate is unreasonable; to permit it would provide opportunity for, and might invite much of the harmful inequality which the statute was enacted to prevent. 2. Nor can the "agreement as to what was a just and reasonable rate, at least for the period of five years" be considered as evidence of continued reasonableness after the effective date of the new tariff to sustain the order, because (a) as to both considerations 1 and 2 the authorities quoted declare that at their inception contracts as to rates are subject to the regulative features of the statute and therefore cannot disqualify or estop the company from performing its duty when necessary; and (b) the agreement that the rate was theretofore reasonable cannot diminish the effect of the prima facie reasonableness attributed by the statute to a rate not challenged within thirty days. 3. We understand the expression "the other evidence in the case" considered by the commission on this question to relate to the agreements that the rates should apply over a long period of time modified only by the coal clause; for the commission, among other references to the contract period, says that "time is an important factor in rate classification." That overlooks the difference between time as a factor specified in a schedule on file, applicable to every consumer (schedule F requires every patron to take service one year) and time required by private contract as here, where it becomes a factor only because the parties agreed in 1916 that service should be rendered under the contracts for twenty-five years, at the then effective rates to be modified as stated. A quotation from the report would seem to indicate the fallacy of the commission's view of this element in the case. The commission says,

"Here the complainant and respondents not only agreed that the filed rates were reasonable and would remain stable for a period of at least five years, but they incurred extraordinary expenses and made important changes upon this assumption which, presumably, they would not have done had the term been shorter or the rates uncertain. This understanding was made when the Public Service Company Law was in effect. It was made on the basis of rates which had been lawfully posted, published and filed. Assuredly no ground of public policy under the evidence before us exists, which requires us to set aside their joint judgment until or unless it be shown that the time element which they have fixed to the legal rate has resulted in or will result in a discriminatory or preferential situation inimical to their other patrons, to the public at large, or that the former rates have become so unjust and unreasonable that respondents on ground of public policy should be relieved therefrom." At most appellants predicted that the rates would remain reasonable during the term, but their prediction was wrong and yielded to the performance of their duty under the statutes when the new rate was made effective. The statute made that rate prima facie reasonable and it became the reasonable rate for these parties because they could not agree upon the rates except subject to the statute; the effect was not as the commission states when it says there is nothing "which requires us to set aside their joint judgment until or unless it be shown that the time element," etc. Here, in legal contemplation, the agreement of the parties was that when in the judgment of one of them,—the public service company alone,—a new rate was required, it should be filed, and if filed for thirty days without complaint it should become the lawful collectible rate, prima facie reasonable and superseding the rate stated in the contract. To hold otherwise would permit the parties by agreement to change the statute when dealing subject to it. "If the shipper sees fit to make a contract

covering a definite period for a rate in force at the time he must be taken to have done so subject to the possible change of the published rate in the manner fixed by statute, to which he must conform or suffer the penalty fixed by law": Armour Packing Company v. United States, 209 U. S. 56 at 82.

We therefore conclude that the agreement that the rates should remain effective during the time specified in the contracts will not support the conclusion of the commission, and it is immaterial whether the time agreed upon is long or short, apparently reasonable or not; the stipulation is unenforceable now and the law will not permit its use as the basis of an inference favorable to a party claiming under it to nullify the result required by the statute. The record contains no legal evidence to support the conclusion that the rates complained of were unreasonable.

2. Turning now to the conclusions of unjust discrimination and unreasonable prejudice, and considering them in the light of our conclusion that the new rates have not been shown to be unreasonable, we observe that the tariff contained a number of schedules; a "residential schedule"; "a small commercial light and power schedule D"; schedule G for "half peak service for installations coming within certain classifications"; and among others, schedule F for "wholesale light and power." Schedule D, for example, included "small commercial consumers with demands not in excess of 20 kilowatts" whereas consumers with demands "from 20 to 5,000 kilowatts are written under rate F."

Section 8, article III, P. L. 1393, provides "It shall be unlawful......(a) to charge......any person...... for any service rendered......a greater or less compensation or sum than it shall demand......from any other person......for a like and contemporaneous service under substantially similar circumstances and conditions......(b) To make or give any undue or unreasonable preference or advantage in favor of or to any per-

son...... or any - particular kind or description of
......service, in any respect whatsoever; or to subject
any particular person......or any particular kind or
description of.......service, to any undue or unreason-
able prejudice or disadvantage in any respect whatso-
ever."

The commission concludes that schedule F of May 31,
1918, is "unjustly discriminatory and unduly and un-
reasonably preferential as against him." Since the
record shows that the rates complained of are reason-
able, as we have concluded, the discrimination cannot be
predicated upon an unreasonable rate, so that other
questions now arise, such as: does any patron in sub-
stantially similar circumstances receive the service at
less rates? or, what if anything, is there about the fur-
nishing of the service to others that results in discrimi-
nation against complainant? As there is no contro-
versy about the character, quality, or adequacy of the
service to complainant as compared with the service to
any other consumer, those possible sources of discrimi-
nation are also eliminated.

We understand the commission to justify its conclu-
sion (1) by the contracts specifying the rates and (2)
by an inference, as is suggested in the report, from ap-
pellants' exhibit number 5 showing the service furnished
in one year to five other large consumers under schedule
F and to two others under schedule A.

(1) As we have already stated, the contracts cannot
support the inference in favor of complainant in the face
of the statute; they were made after the enactment of
the Public Service Company Law and with full knowl-
edge of the public policy of the state so declared.

(2) We cannot agree with the inference from exhibit
5. The commission says: "The remainder of the consum-
ers, noted in this exhibit, are office and store properties,
for which the demand and consumption factors are so
much less than for the Frick buildings as to suggest that
there should be separate consideration and classifica-

tion for heat and electric services." This suggestion is carried into the order which requires appellants to file "a supplemental tariff, providing for other classifications than those now on file, which would be applicable to services rendered for steam heat and electric light and power in the Frick buildings mentioned, and to such other patrons as may hereafter fall within these classifications, and these at the rate in effect on November 15, 1916."

But the evidence is that the differences resulting from the effect of the "demand and consumption factors" of the consumers mentioned on the one hand, and the same factors for complainant on the other, resolve themselves automatically and fairly in schedule F; the exhibit shows that by schedule F with the operation of those factors, under the load specified, complainant paid an average price for the year of 14.1 mills per kilowatt hour, while the Jenkins Arcade and the Kaufman paid more, the former paying an average of 17.38 mills and the latter 14.9 mills. There is no evidence to show, for example, that in such circumstances when the Jenkins Arcade pays 17.38 mills and Kaufman 14.9 mills, complainant should pay less than 14.1 mills. There is no evidence that the service is not worth what he pays for it, or, laying aside the contracts as we must, that there is anything peculiar or special about rendering the service to him compared with serving the other patrons taking under schedule F. No evidence appears of relative inequality or of favorable treatment of any consumer unjustly injuring complainant; it is the same general service rendered to them all relatively in the same way in a comparatively small area in the city; there is nothing about the service to him, for example, analogous to a patron who is willing to take current at off-peak periods at an average load factor of not less than 50% under schedule G.

The testimony is uncontradicted that schedule F was arranged according to the "usual and customary method of fixing rates." The commission said "the schedule

recognizes as a principle in rate-making, the giving of an advantage in rates both on higher demands and on the greater amounts of energy consumed." The statute permits that. A witness testified the schedule established "a differential there in favor of the larger user," a "differential based upon increased consumption or greater consumption"; "the larger consumer gets an advantage of consumption; both through the demand charge and the amount of energy consumed." Complainant has the benefit of each incident so specified. The average rates per kilowatt hour paid by the consumers taking under schedule F of course varied according to the factors of demand and consumption and load which were in their own control. The tariff was constructed to provide for that. It was so for all patrons. Demand was defined in schedule F as "the greatest number of kilowatts or maximum demand of energy used at any one time for a continuous period of five minutes"; the schedule provided that "demands may be determined from time to time at the option of either party......" Exhibit 2 shows that for the short period covered by it demands on the service to complainant were apparently taken and recorded as follows: 5-129 1205 kilowatts; 6-20 1429 kilowatts; 7-22 1190 kilowatts; 8-27 1372 kilowatts. The contract of November 15, 1916, stated the demand to be 1266 kilowatts. Exhibit 5 shows that for the year covered by that exhibit the average demand was 1,829 kilowatts; to produce that average, complainant's demand must therefore at some time in the year have greatly exceeded 1,829 kilowatts. Exhibit 2 shows that of 1,618,380 kilowatt hours included in that bill, the larger part,—over 1,169,000 kilowatt hours,—was taken in excess of both the first and second step or quantity blocks of energy, i. e., in the third block specified in schedule F, and therefore at the lowest rate. Complainant's low average charge per kilowatt hour is due to the regulations applying the rates in schedule F to the incidents of his service, enabling him to receive a very large

part of the current in the third block and at the lowest rate, which of course brings down his average per kilowatt hour; the Jenkins Arcade and Kaufman receive precisely the same treatment by the same regulations though the incidents of their service do not give them as low an average; but all get the service at the same time in substantially similar circumstances. We all agree that the evidence discloses nothing in the operation of the schedule to justify making any further distinction in favor of complainant than the rules provide, a distinction enjoyed and apparently regarded as adequate from November 15, 1916, until the complaint was filed; and it will be noted that while the rates only were raised, the rules applying the rates are still what they were in 1916. The statement of a witness that "there are no office buildings that compare in size and demand with the group of the Frick buildings" does not, as the commission apparently concluded, place "the Frick buildings, as one of the respondent's witnesses stated in a class by itself ( ?) both with respect to heat and electricity" in the sense that the service for those buildings requires a different classification from other wholesale users taking under schedule F. This witness testified that under schedule F the Frick building "earns a lower rate than any customer we have in the down town commercial district; earns a lower rate than some of our large industrial plants"; and he said the reason for the low rate per kilowatt hour charged was "because of the size of the demand and its load factor"; that was possible by schedule F; it resulted in a lower rate per kilowatt hour for complainant than most other users under the same schedule referred to in the record; though complainant has that advantage by schedule F, it does not appear that any other user is more favorably treated.

Moreover the undisputed evidence is that the service rendered to these Frick buildings naturally comes under schedule F; it was made up by "the usual and customary method of fixing rates." That much of the elec-

tricity and some of the steam is generated or transformed on premises leased from complainant can give him no preference; the service is furnished to him relatively at the same place at which it is furnished to other consumers, at or about the edge of his property; in that connection it is immaterial that complainant is appellants' lessor; nor is it material in the circumstances of this inquiry that appellants are not required to carry their product far; under the evidence here, those incidents entitle complainant to no more favorable treatment than others. Furthermore the classification denounced by the commission is the same classification that existed when the contracts of November 15, 1916, were made. There is nothing to show any change since then in the character of the service to the Frick buildings or to complainant's status as consumer or to show any new element not resolved by the factors of demand and consumption under the provisions of schedule F, or any change in the relation of any other large user justifying a different scale or other graduation of price to consumers. If service was rendered under schedule F from 1916 to 1918 as both parties conceded, without unjust discrimination against complainant, nothing occurring since has been shown, making the continuance of that service under F unjustly discriminatory or otherwise justifying the commission in taking him out of schedule F and requiring that a new tariff be framed to include him.

Other questions are presented. After the proceedings had begun complainant died testate, devising the Frick building and the Frick Annex in trust for his daughter for life and over; the Union Arcade passed to his executors as part of his residuary estate. The executors and the trustee for decedent's daughter appeared before the commission and were substituted as complainants. In view of the conclusion reached above, it is unnecesary to consider the questions raised in consequence of that change in the titles to the buildings or the remaining

criticism that the order is too indefinite. All the parties agreed at the argument that no point should be made of the joinder of the two appellants in a single order below.

The order of the commission is reversed and the record remitted to the Public Service Commission with instructions to dismiss the complaint.